Mill Supplies Corporation v. Commissioner.
Mill Supplies Corp. v. Commissioner
Docket No. 10479.
United States Tax Court
1947 Tax Ct. Memo LEXIS 33; 6 T.C.M. (CCH) 1225; T.C.M. (RIA) 47313; November 19, 1947
Thomas J. Bailey, Esq., and M. D. Harris, C.P.A., 1102 Olds Tower Bldg., Lansing, Mich., for the petitioner. Wesley A. Dierberger, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This case involves the following deficiencies: Declared
Value
Excess
Excess Profits
Income Tax
Profits Tax
Tax
Year
Deficiency
Deficiency
Deficiency
1941
$2,844.30
$ $ 4,684.51
1942
52.25
2,214.74
26,565.96
$2,896.55
$2,214.74
$31,250.47 The sole question presented is whether salary and bonus paid to the petitioner's principal officer was reasonable compensation for personal services rendered. A stipulation filed covers a part of the facts and we find them to *34 be as stipulated. So far as considered necessary to discussion of the issue they will be set forth together with facts found from other evidence in our Findings of Fact 1. The petitioner is a corporation organized in 1922, with its principal office in Lansing, Michigan. Its Federal income and excess profits tax returns were filed for the taxable years with the collector for the District of Michigan and on an accrual basis of accounting. Since some time in u924, the petitioner's business has been wholesale mill supplies. Only a very small amount of retail business is done. 2. Carl B. Pfeifer is and since 1924 has been petitioner's president and general manager and (since 1936) treasurer. Since about 1935 he has owned about 98 per cent of petitioner's capital stock, the stock being owned in the taxable years as follows: m702,25,18 Carl B. Pfeifer 2448 shares
Albert A. Elsesser 52 shares
Total stock outstanding 2500 shares, par value $10 each The petitioner's board of directors during the taxable years consisted of Pfeifer, his wife, and Elsesser, who is a banker, and was secretary, but not active in the company. 3. Petitioner paid to Pfeifer a salary and bonus, and as compensation *35 paid to him, deducted on its Federal income and excess profits tax returns, for the taxable years, the following amounts: For 1941 - $24,000; for 1942 - $45,399.48. The Commissioner in determining the deficiency disallowed these amounts, above $12,600 for each year, the disallowance being $11,400 and $32,799.48, respectively. 4. Salaries were paid by the petitioner during the taxable years, pursuant to action of its board of directors, in substance as follows On February 7, 1941, Pfeifer and Elsesser being the directors present, the board voted a salary of $800 a month to the president-treasurer-general manager, and $10 a month to Elsesser, the secretary, discussed bonus payment, decided to continue some system of bonus payment, but to study the matter further. On November 7, 1941, the board, at a meeting in the office of Max Harris (petitioner's cost accountant and counsel for petitioner herein, and with whom the bonus plan was discussed), Pfeifer and Elsesser being the directors present, report of sales for 1941 were reviewed and it was found that they exceeded by about 85 per cent those for the same period of 1940, also that there were over $250,000 unfilled orders from industries *36 doing defense work. On motion of Pfeifer, seconded by Elsesser, it was voted to pay a dividend of $1.50 a share, before the end of the year; and on motion of Elsesser, seconded by Pfeifer, it was voted to pay Pfeifer a cash bonus of $14,400 for services for 1941. On February 6, 1942, Pfeifer and Elsesser being the directors present, the board after electing corporate officers, including Elsesser as secretary, considered at length salaries and bonuses, in view of the very greatly increased sales, and work involved. Pfeifer pointed out that sales and sales volume of unfilled orders were increasing very rapidly, that the work involved was extremely difficult and required extra hours, that regulations and reports for the War Production Board were onerous; and it was decided to continue during 1942 substantially the same general bonus incentive plan as for 1941. Pfeifer was instructed to study thoroughly anticipated sales and profits for 1942 and to outline a plan and to report. On February 14, 1942, Pfeifer and Elsesser being the directors present, Pfeifer reported his study of anticipated sales and profits for 1942. No conclusion was reached, Pfeifer being directed to continue his study *37 and report further. On February 27, 1942, the directors present being Pfeifer and Elsesser, salaries for 1942 were fixed as: For president-treasurer-general manager, $1,000 a month; for secretary, $10 a month. A bonus plan was outlined by Pfeifer, in effect, as follows: Employees were classified into groups "A" and "B", group "A" to consist of old employees constituting the directing personnel of the company, group "B" to include all others. Group "A" would be Pfeifer - president-treasurer-general manager; Kowalk - acting chief accountant; Elmo Scott - purchasing agent; Bernard Smith - service engineer and salesman; Bierbower - clerk of warehouse; and Robert Gates - assistant accountant and chief price clerk. Group "A" would receive definite salaries as follows: Pfeifer - $1,000 a month; Kowalk and Scott each $40 a week; Bierbower and Gates each $28 a week; and Smith - $36 a week; also two bonuses, first a service bonus to be paid when and in amounts specified by the president or board of directors, the aggregate of each employee's salary and service bonus for 1942 not to exceed that for 1941; and, second, an incentive bonus to be paid at the end of 1942, to be determined "by multiplying *38 each employee's total salary and service bonus for the year 1942 by the factor of 75% of the percentage by which the company's 1942 net sales exceeds the company's 1941 net sales," 70 per cent of the incentive bonus to be paid in Government bonds; employees voluntarily leaving employment to lose all participation not already paid; and in case of death, disability, or severance of employment because of entry into this country's military service, the employee to participate for three months, but not longer than December 31, 1942; group "B" employees to receive compensation at the going rate of pay in the community, and the board reserving the right to pay group "B" employees a bonus at the end of 1942. The above plan was adopted on motion of Pfeifer and second of Elsesser. 5. Sales, salaries, net profits, and dividends paid by the company for the years 1924-1942, inclusive, are as follows: Total
Salaries
C.B.
Other
Group
Net Profit
and
Pfeifer's
Group "A" *
"B" *
Before
Dividends
Year
Sales
Wages
Compensation
Salaries
Wages
Income Tax
Paid
1924
$ 39,293
$ 4,878
$ 2,400
None
$ 2,478
$ 507
1925
64,162
6,422
3,000
1,139
2,283
197
1926
84,475
7,496
3,000
1,436
3,060
1,972
1927
103,793
12,168
4,650
1,920
5,598
1,929
1928
147,681
18,446
6,400
3,121
8,925
2,982
1929
204,211
28,326
9,850
3,641
14,835
2,961
1930
100,739
11,812
2,300
3,745
5,767
2,983
1931
64,101
6,538
500
3,952
2,086
38
1932
46,737
14,405
6,000
2,594
5,811
(8,669)
1933
75,133
10,643
7,437
2,173
1,033
148
1934
147,602
20,393
14,446
4,525
1,422
1,904
1935
165,834
16,046
7,200
6,367
2,479
2,382
1936
202,307
17,736
7,200
9,099
1,437
9,474
$4,538
1937
256,648
28,714
14,700
11,230
2,784
4,506
1938
97,991
17,111
7,700
9,026
1,385
(440)
1939
163,913
20,947
10,000
9,431
1,516
6,444
4,375
1940
209,497
25,728
12,600
10,718
2,410
8,730
2,500
1941
393,454
44,616
24,000
17,677
2,939
30,980
3,750
1942
861,217
87,708
45,399
33,724
8,585
52,218
*39 6. The company's ten largest customers serviced exclusively by Pfeifer, and the net sales made to them in 1941 and 1942, are as follows: 1941
1942
Nash Kelvinator Corp.
$ 9,617.30
$318,487.29
Oldsmobile Div. of G.M.
126,567.63
177,003.67
Reo Motors Inc.
24,014.80
53,211.27
Novo Engine Company
9,949.70
12,750.55
Wohlert Corporation
28,474.28
10,902.46
Lundberg Screw Prod-
ucts Company
12,899.47
14,940.05
John Bean Manufactur-
ing Company
9,279.95
8,951.06
Motor Wheel Corp.
48,977.04
97,829.78
Atlas Drop Forge Co.
24,439.29
33,733.98
Lansing Stamping Co.
4,913.27
3,697.63
$299,132.72
$731,507.74 Some of the largest accounts were secured in 1923-1924. 7. Details of compensation paid group "A" employees for 1939-1942, are as follows: 1939
1940
1941
1942
CARL B. PFEIFER: Salary
$ 7,200.00
$ 9,600.00
$ 9,600.00
$12,000.00
Service Bonus
2,800.00
3,000.00
14,400.00
12,000.00
Incentive Bonus
21,399.48
TOTAL
$10,000.00
$12,600.00
$24,000.00
$45,399.48
L. L. KOWALK: Salary
$ 2,080.00
$ 2,080.00
$ 2,080.00
$ 2,109.08
Service Bonus
205.97
504.24
2,136.60
2,107.52
Incentive Bonus
3,759.71
TOTAL
$ 2,285.97
$ 2,584.24
$ 4,216.60
$ 7,976.31
E. E. SCOTT: Salary
$ 2,080.00
$ 2,080.00
$ 2,080.00
$ 2,109.08
Service Bonus
205.97
504.24
2,136.60
2,107.52
Incentive Bonus
3,759.71
TOTAL
$ 2,285.97
$ 2,584.24
$ 4,216.60
$ 7,976.31
B. L. SMITH: Salary
$ 1,701.96
$ 1,701.96
$ 1,823.00
$ 1,897.17
Service Bonus
168.50
412.56
1,680.65
1,719.18
Incentive Bonus
3,124.01
TOTAL
$ 1,870.46
$ 2,114.52
$ 3,503.65
$ 6,740.36
HARRY BIERBOWER: Salary
$ 1,456.00
$ 1,456.00
$ 1,456.00
$ 1,551.82
Service Bonus
144.18
352.93
1,495.78
1,404.66
Incentive Bonus
2,631.94
TOTAL
$ 1,600.18
$ 1,808.93
$ 2,951.78
$ 5,588.42
ROBERT GATES: Salary
$ 1,262.80
$ 1,310.80
$ 1,448.00
$ 1,551.82
Service Bonus
125.64
315.31
1,330.43
1,404.66
Incentive Bonus
2,486.29
TOTAL
$ 1,388.44
$ 1,626.11
$ 2,778.43
$ 5,442.77
SUMMARY
TOTAL COMPENSATION GROUP "A"
Salary
$15,780.76
$18,228.76
$18,487.00
$21,218.97
Service Bonus
3,650.26
5,089.28
23,180.06
20,743.54
Incentive Bonus
37,161.14
TOTAL
$19,431.02
$23,318.04
$41,667.06
$79,123.65
*40 8. At the end of 1942, the company, after paying the employees under the bonus plan, did not have money enough left to pay a dividend without impairing its financial structure. The money was needed in the business. Therefore no dividend was paid for 1942. 9. The principal items sold by the company are abrasives, cutting tools, grinding wheels, taps, dies, and files, though it carries in inventory from 6,500 to 7,500 items. It does not manufacture, but resells items purchased from others. During the taxable years it occupied three floors of a building about 22 feet wide and 100 feet long, paying $125 a month rent, in addition to paying for heat. In 1941 it employed 11 men, in 1942 (including Pfeifer and Elsesser) about 19. The class "A" group in 1941 consisted of six, including Pfeifer, the class "B" group, about seven men. The company has a service problem in connection with its sales. It is necessary to service its customers to the extent necessary to get orders in preference to its competitors. It tests and corrects tools sold, observes their operation in the plants to which they are sold, checks speeds, and makes suggestions for use and corrections. 10. Pfeifer graduated from *41 the University of Michigan in 1914, in the school of engineering, where he had studied chemical engineering, specializing in metallurgy. While in school, he assisted in the qualitative chemical laboratory. He was admitted to two honorary engineering fraternities. After graduating, he worked in various positions, including the Research Metallurgical Laboratory of General Motors Corporation, among other work investigating the properties of steel, and curburizing compounds; also worked as steel salesman for a firm in Brooklyn, New York, involving instruction of customers as to heat treatment; was in the army 1917-1919, assigned to metallurgical work, drawing up specifications for metals for the Signal Corps, which were used on the Liberty Engine; then worked again, as a metallurgical steel salesman, later as assistant sales manager in New York, and later at Detroit. This involved servicing, going into the plants and heating rooms where the steel is proved. In 1922 he started at Lansing, Michigan, the mill supply business for the predecessor of the company, being one of the incorporators. He had not earlier sold mill supplies. He invested $4,000 in the business and started as manager of *42 the mill supply department, at a decreased salary. He considered Lansing a good place to start his own business. He, in effect, constituted the mill supplies department until 1924, when his associate withdrew and he changed the corporate name to Mill Supplies Corporation. Up to 1935, he solicited all accounts, and was the only salesman. He obtained a number of good customers. The company has never lost a customer. In 1935 a new salesman was put to work, contacting the smallest customers, and new customers. Pfeifer obtained customers to whom about 95 per cent of all sales are made. 11. After the effect of the war began to be felt, about 1941, trouble started with priorities, including those applied by the War Production Board and War Defense Plant Corporation. Form applications had to be made and regulations studied, often involving study at night. Pfeifer devised a system of complying with the orders, which the office manager operated under instructions. This continued through 1942. During those years, Pfeifer worked long hours, including Sundays and holidays, more hours than in 1940. He exclusively obtained and called upon a number of important customers, including Nash Kelvinator *43 Corporation late in 1941, obtained through his knowing the company's tool supervisor and general manager. He serviced Nash Kelvinator in 1941-1942, particularly as to abrasives on grinding wheels, often going to the plant, studying operations, specifying grinding wheels and proper tools. He drew the specifications on which Nash Kelvinator set up its system of tools and grinding wheels. He had assistance on Tuesdays from a salesman, also for a while of a man direct from the manufacturer, for which the petitioner was distributor. He was in 1942, but not often in 1941, sometimes about three or four times a week, called at night, sometimes out of bed, to do servicing or furnish information or items. One-fourth of the calls would be for service or materials. This was not at the Nash Kelvinator plant. He had a pass into that plant. The company furnished the same service to all customers as to Nash Kelvinator. The company had 50-75 customers. Nash Kelvinator and other customers were making many military items used by the Government in the war. Pfeifer worked from 11 to 14 or 15 hours a day in 1942. War work in the customers' plants meant additional work for him, specifying and selling tools, *44 going to the plants and making the tools work. Pfeifer supervised the work of all employees. 12. A bonus plan was first started by the company in 1939, and was in effect also in 1940. It was a loose arrangement to pay one-third of estimated profits to the key men, six besides Pfeifer who was not then included, but received a bonus by board action. 13. Prices were set by manufacturers, on about 75 per cent of material sold by the petitioner. Petitioner had no government contracts, its dealings being with the manufacturers-contractors. It had no particular sales problem in the taxable years. 14. Commissions paid to salesmen of the products handled by petitioner are from 5 to 10 per cent. A salesman gets credit for repeat orders from customers he has contacted. 15. Reasonable compensation for the services of Pfeifer actually performed was $18,000 in 1941 and $27,500 in 1942. Opinion We have here the familiar question as to the amount a closely held corporation may pay its principal officer and deduct as compensation for personal services actually rendered, under section 23 (a) (1) of the Internal Revenue Code. Cases, that the question is one of fact, *45 to be resolved from all facts presented, do not need to be reiterated. We have studied the record before us carefully seeking a fair answer to the difference between petitioner and respondent. It seems altogether pointless to set forth at great length all facts which have impelled the conclusion to which we have arrived. Upon analysis thereof, we think there is discernible here a tendency to pay earnings out as deductible salaries, rather than nondeductible dividends, which must be recognized, along with the undoubted unusual ability and diligent application of the officer involved. Pfeifer, the petitioner's president-treasurer-general manager was owner of roughly 98 per cent of its stock. So far as control was concerned, it was in effect a one-man corporation. The dicated the policies, and with Elsesser was the active board of directors, his wife not appearing, though she was a director. It was obviously to his interest as principal, almost sole, stockholder, that the corporation's earnings be disbursed to him as salaries, rather than dividends. We think that interest colors and affects the situation presented, to an extent not overcome by the facts of devotion to work and experience, *46 training and exceptional competency. Though percentagewise five other "key" men received the same bonus, the amounts are very small in comparison, with the general result that Pfeifer received as compensation a large portion of earnings, the others a small part - and non-"key" men, or group "B" employees, a much smaller amount as a total. Thus in 1941 of a total of $44,616, salaries and bonus, $24,000 went to Pfeifer, $17,677 total to the other five group "A" men (an average of $3,535.40 each, and the highest being $4,216.60), while the other employees received a total of $2,939. In 1942, Pfeifer received $45,399, the five other group "A" a total of $33,724, and all others $8,585. We think the fact of the same percentage to all group "A" men is not greatly important, in the light of the above figures and the fact that basic salaries were the basis for computation of the bonuses. That the bonus plan for 1942 was outlined early in the year instead of the end is seen as not greatly different than if determined at the end of the year, since the bonuses were calculated by use of a factor of increase in net sales over the previous year. That the bonus depended upon the year's business is *47 accented by the petitioner's argument on brief that "the bonus arrangement was hinged to volume of sales and not net profits." That it was in anticipation of increased sales is shown by the analysis made in November 1941, showing an 85 per cent increase in sales over 1940, with $250,000 unfilled orders, the consideration of greatly increased sales on February 6, 1942, the decision to study anticipated sales, and the report thereon on February 14, 1942. When considered with the dividend of $3,750 for 1941 and none for 1942 because, after payment of bonuses, there was not sufficient with which to pay and have left proper capital, we think the attention paid to sales in fixing bonuses indicates desire to pay out earnings as salaries before dividends. That they were not figured on profits is not seen as important, considering all the facts, the clear prospects of sales, meaning increased earnings. Though these considerations must enter here, likewise must Pfeifer's exceptional ability, and the fact that the company's prosperity clearly depended on him. Comparison with salaries and bonuses paid like executives, a usual method of proving value of services, is not suggested here. Though *48 one man in a somewhat similar situation was placed on the witness stand, the petitioner asks no findings based on a comparison with his earnings, apparently because his position was not regarded sufficiently similar; and we agree and find no definite aid there. However, it was shown that the commissions of salesmen of commodities such as sold by the petitioner were from 5 to 10 per cent, with credit for repeat orders. Sales by petitioner to the ten customers serviced by Pfeifer alone were roughly $300,000 in 1941, and $730,000 in 1942. The petitioner had no sales problem in the war years here involved. On all of the facts presented, we think that petitioner's figures are not justified; but we think the same of those of the respondent. On the facts presented, we hold that reasonable compensation for the services of Pfeifer actually performed was $18,000 in 1941 and $27,500 in 1942. Decision will be entered under Rule 50. Footnotes
*. Prior to the year 1942 employees were not classified as Group "A" and Group "B." They are so classified in the table for purposes of clarity.↩